**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**
_____

VILLAGE OF OLD MILL CREEK, *et al.*,

*Plaintiffs-Appellants*,

v.

ANTHONY STAR, in his official capacity as
Director of the Illinois Power Agency, *et al.*,

*Defendants-Appellees*,

_____

ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*,

*Plaintiffs-Appellants*,

v.

ANTHONY STAR, in his official capacity as
Director of the Illinois Power Agency, *et al.*,

*Defendants-Appellees*,

_____

On Appeals from the United States District Court for the Northern District of
Illinois, Nos. 1:17-cv-01163 & 1:17-cv-01164, Hon. Manish S. Shah, District Judge

_____

**Amici Curiae Brief of Natural Resources Defense Council,
Environmental Defense Fund, Citizens Utility Board, Elevate Energy and Respiratory
Health Association in Support of Defendants-Appellees and Affirmance**

_____

Michael Panfil
Environmental Defense Fund
1875 Connecticut Ave. NW
Washington, DC 20009
(202) 572-3280
mpanfil@edf.org

Miles Farmer
Natural Resources Defense Council
40 W. 20th St.
New York, NY 10011
(212) 727-4634
mfarmer@nrdc.org

[Additional Counsel Listed on Inside Cover]

Anne McKibbin
Policy Director
Elevate Energy
322 S. Green St., Suite 300
Chicago, IL  60607
(773) 269-2225
Anne.McKibbin@ElevateEnergy.org

Joel J. Africk
Respiratory Health Association
1440 W. Washington St.
Chicago, Illinois 60607
(312) 243-2000
jafrick@lungchicago.org

Thomas Zimpleman
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 513-6244
tzimpleman@nrdc.org

Kristin Munsch
Deputy Director
Citizens Utility Board
309 W. Washington St., Suite 800
Chicago, IL 60606
(312) 263-4282
kmunsch@citizensutilityboard.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and the corresponding Circuit Rule:

Natural Resources Defense Council, Inc. is a non-profit organization based in New York. It is not a publicly held corporation, and has no outstanding stock shares or other securities in the hands of the public. It does not have any parent company, and no companies have a ten percent or greater ownership interest in it.

Environmental Defense Fund is a non-profit organization based in New York. It is not a publicly held corporation, and has no outstanding stock shares or other securities in the hands of the public. It does not have any parent company, and no companies have a ten percent or greater ownership interest in it.

The Citizens Utility Board is a non-profit organization based in Illinois. It is not a publicly held corporation, and has no outstanding stock shares or other securities in the hands of the public. It does not have any

parent company, and no companies have a ten percent or greater ownership interest in it.

Elevate Energy is a non-profit organization based in Illinois. It is not a publicly held corporation, and has no outstanding stock shares or other securities in the hands of the public. It does not have any parent company, and no companies have a ten percent or greater ownership interest in it.

Respiratory Health Association is a non-profit organization based in Illinois. It is not a publicly held corporation, and has no outstanding stock shares or other securities in the hands of the public. It does not have any parent company, and no companies have a ten percent or greater ownership interest in it.

The names of all attorneys and law firms who have represented or are expected to represent these non-profit organizations are:

(1) Joel J. Africk, Respiratory Health Association;

(2) Ann Alexander, Natural Resources Defense Council;

(3) Miles Farmer, Natural Resources Defense Council;

(4) Anne McKibbin, Elevate Energy;

(5) Kristin Munsch, Citizens Utility Board;

(6) Michael Panfil, Environmental Defense Fund; and

(7) Thomas Zimpleman, Natural Resources Defense Council.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES .................................................................................... v

INTEREST OF AMICI CURIAE ............................................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 4

ARGUMENT ......................................................................................................... 6

I.      The ZEC program is not preempted by the FPA ............................................ 6

    A.      The FPA preserves states' traditional authority to regulate emissions and other elements associated with electricity generation ..................................... 8

    B.      The ZEC program falls squarely within state authority ............................. 10

        1.      ZECs are not payments "for or in connection" with FERC-jurisdictional sales ................................................................................................................. 11

        2.      In affirming the district court, the Court should reject the assumption that FERC's jurisdiction over practices affecting rates is exclusive ................................ 15

    C.      Finding the Illinois ZEC program preempted by the FPA would undermine states' clean energy policies ......................................................... 20

II.      The ZEC program does not violate the dormant Commerce Clause ..................... 30

    A.      States have longstanding authority to address environmental and public health risks, including those related to energy .............................................. 30

    B.      The dormant Commerce Clause is not a license to second-guess legitimate state policy designs ......................................................................................... 35

CONCLUSION ..................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Allco Fin. Ltd. V. Klee*, 861 F.3d 82 (2d Cir. 2017) ............................................................ passim

*Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496 (7th Cir. 1989) ............... 36

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375 (1983) ................................... 9

*Cal. Indep. System Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004) ........................... 17

*Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, No. 16-CV-8164 (VEC), 2017 WL
    3172866 (S.D.N.Y. July 25, 2017) ....................................................................................... 21

*Dep't of Rev. of Ky. v. Davis*, 553 U.S. 328 (2008) .................................................................... 30

*Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169 (10th Cir. 2015) ........................................ 30

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393 (2d Cir. 2013) .............................. 9

*Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978) ......................................................... 34, 35

*Fed. Power Comm'n v. La. Power & Light Co.*, 406 U.S. 621 (1972) .......................................... 7

*FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760 (2016) ............................................. passim

*Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016) ............................................. passim

*Ky. W. Va. Gas Co. v. Pa. Publ. Util. Comm'n*, 837 F.2d 600, 608 (3d Cir. 1988) ................... 26

*Maine v. Taylor*, 477 U.S. 131 (1986) ........................................................................................ 35

*Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724 (1985) ................................................................... 31

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) .................................................. 33

*Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124 (7th Cir. 1995) ............... 34, 36

*New Energy Co. of Ind. v. Limbach*, 486 U.S. 269 (1983) ............................................................ 30

*New York v. FERC*, 535 U.S. 1 (2002) .................................................................................. 13

*ONEOK, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015) ................................................. 7, 16, 18, 19

*Rochester Gas & Elec. Corp. v. Pub. Serv. Comm'n of State of N.Y.*, 754 F.2d 99 (2d Cir. 1985)

............................................................................................................................... 15

*Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183 (2d Cir. 2008) ... 9

**Federal Statutes**

16 U.S.C. § 824 ............................................................................................................. 4

16 U.S.C. § 824(b) ........................................................................................................ 8

16 U.S.C. § 824d ........................................................................................................ 20

16 U.S.C. § 824d(a) ..................................................................................................... 8

16 U.S.C. § 824e(a) ..................................................................................................... 8

16 U.S.C. §§ 824d(a) ................................................................................................... 8

**State Statutes**

20 ILCS § 3855/1-75(d-5)(1)(B) .................................................................................. 14

20 ILCS 3855/1-75(d-5)(1)(C) .................................................................................... 33

73 Pa. Cons. Stat. § 1648.3 ......................................................................................... 23

73 Pa. Stat. Ann. § 1648.3(f)(4) .................................................................................. 25

Cal. Pub. Util. Code § 2836-2837 ............................................................................... 28

Colo. Rev. Stat. § 40-2-124 § 1(g) ............................................................................. 26

D.C. Code § 34-1431 ........................................................................................ 23

Del. Code Ann. 26 § 351 ................................................................................... 23

Md. Pub. Utils. Code Ann. § 7-701 ................................................................. 23

Me. Rev. Stat. Ann. Tit. 35-A, §3210(9)(A) .................................................. 25

Mo. Rev. Stat. § 393.1030(2)(1) ...................................................................... 26

Mont. Code Ann. §69-3-2007(2) ..................................................................... 26

N.J. Rev. Stat. Ann. § 48:3-87 ......................................................................... 27

Nev. Rev. Stat. Ann. § 704.7821(2)(c) ........................................................... 26

Ohio Rev. Code Ann. § 4928.64(C)(3) ........................................................... 26

**Federal Regulatory Decisions**

*Am. Ref-Fuel Co.*, 105 FERC ¶ 61,004 (2003) ............................................. 10

*Cal. Pub. Utilities Comm'n*, 133 FERC ¶ 61,059 (2010) ............................. 14

*Order Terminating West-Wide Must-Offer Requirements*, 157 FERC ¶61,051 (2016) ........... 15

*PJM Interconnection, LLC*, 115 FERC ¶ 61,079 (2006) ............................... 23

*WSPP, Inc.*, 139 FERC ¶ 61,061 (2012) ............................................... 14, 20

**State Regulations**

225 Mass. Code Regs. 14.08 ............................................................................. 25

26 Del. Code Regs. § 363(f) .............................................................................. 26

65-407 Me Code. R. Ch. 311, § 3 ..................................................................... 25

Kan. Admin. Regs. 82-16 .................................................................................. 26

N.J. Admin. Code. § 14:8-2.8........................................................................................... 23

N.M. Admin. Code § 17.9.572.12 ................................................................................... 26

**Other Authorities**

An Act Relative to Energy Diversity, Chapter 188 of the Acts of 2016 § 15(b) ................. 28

Arthur C. Stern, *History of Air Pollution Legislation in the United States*, 32 J. Air Pollution

   Control Ass'n 44 (1982)........................................................................................... 31

Chicago Climate Action Plan, *Climate Change and Chicago* (Nov. 7, 2007) ......................... 32

Edward Holt, Clean Energy States Alliance, CESA State RPS Policy Report: Increasing

   Coordination and Uniformity Among State Renewable Portfolio Standards (2008)... 27

Envtl. Prot. Agency, *What Climate Change Means For Illinois* EPA 430-F-16-015 (Aug.

   2016) ....................................................................................................................... 32

Galen Barbose, *U.S. Renewables Portfolio Standards: 2016 Annual Status Report* (Apr. 2016)

   ............................................................................................................................. 5, 25

NRDC, *NRDC Policy Basics: Nuclear Energy* (Feb. 2013) ....................................................... 3

*Order Adopting a Clean Energy Standard, No. 15-E-0302 (N.Y. P.S.C. Aug. 1, 2016)*............ 27

*Potential Nuclear Power Plant Closings in Illinois* (Jan. 5, 2016) ............................................... 32

Pricing Carbon Into NYISO's Wholesale Energy Market to Support New York's

   Decarbonization Goals (2017)................................................................................... 28

R. Frankson, K. Kunkel, S. Champion, B. Stewart, D. Easterling, B. Hall, and J. R. Angel,

   *Illinois State Summary*, NOAA Technical Report, NESDIS 149-IL (2017) ...................... 32

S.B. 1652, Energy Infrastructure Modernization Act, Pub. Act 97-0616 (Ill. 2011) ........... 31

S.B. 2814, Future Energy Jobs Act, Pub. Act 99-0906 (Ill. 2016) .......................................... 32

## INTEREST OF AMICI CURIAE

Amici curiae Environmental Defense Fund (EDF) and Natural Resources Defense Council (NRDC) are national non-profit environmental advocacy organizations. Curbing climate change and building the clean energy future are among both organizations' top institutional priorities.

Citizens Utility Board (CUB) is a statutorily-created, not-for-profit organization with approximately 100,000 members across Illinois. CUB's mission is to represent the interests of residential and small commercial utility customers in state and federal regulatory and judicial proceedings.

Elevate Energy is a non-partisan, not-for-profit organization with a mission of promoting smarter energy use for all. Elevate Energy designs and implements energy efficiency programs that ensure the benefits of energy efficiency, demand response, and clean energy reach those who need them most.

Respiratory Health Association (RHA) is a regional not-for-profit organization with a mission to prevent lung disease, promote clean air, and help people live better through education, research and policy change.

RHA has long been active in promoting public policies that reduce air pollution, and as there are documented health risks from climate change, RHA's work includes addressing numerous risks to human health exacerbated by the greenhouse gas emissions driving global warming and destabilizing the earth's climate.

Amici were leading members of the Illinois Clean Jobs Coalition, which advocated for the passage of the Future Energy Jobs Act, Pub. Act No. 099-0906 (Ill. 2016) (FEJA). Amici frequently advocate before federal regulatory bodies, wholesale energy market operators, state siting and regulatory authorities, and federal courts to promote and defend clean energy policies.

FEJA contains a suite of policies aimed at making Illinois a leader in fighting climate change, improving public health, and cost-effectively decarbonizing the electricity sector. These policies include (1) improvements to the state's Renewable Portfolio Standard (RPS), a program requiring, among other things, that a specified percentage of energy come from renewable sources, as verified through Renewable

Energy Credits; (2) significant solar energy incentives, including a community solar program; and (3) a strong energy efficiency program. FEJA also includes a program of Zero Emissions Credits (ZEC), designed to preserve emissions avoidance caused by nuclear power plants by providing compensation for it for ten years. Amici jointly and strongly support FEJA as a whole because of the important clean energy, consumer, human health, and environment measures it includes, and because it will move Illinois away from its current reliance on fossil fuels toward a clean energy future.[1] Amici take no joint position on nuclear power,[2] however, and file this brief to protect and preserve well-established state authority over energy policy.

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person has contributed money that was intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief.

[2] NRDC is skeptical of nuclear power because of the significant safety, global security, environmental, and economic risks that the use of this technology imposes on society. For background on NRDC's stance on nuclear power, see NRDC, *NRDC Policy Basics: Nuclear Energy* (Feb. 2013), https://www.nrdc.org/sites/default/files/policy-basics-nuclear-energy-FS.pdf.

## SUMMARY OF ARGUMENT

Plaintiffs' challenge to Illinois' ZEC program depends upon overbroad theories of preemption that are inconsistent with the careful delineation of federal and state responsibilities in the Federal Power Act (FPA), 16 U.S.C. § 824 *et seq.*, and with federal court precedent applying the FPA. Plaintiffs' position, if adopted by the Court, would create widespread uncertainty over state clean energy programs by undercutting the traditional authority states draw upon to promote the development and use of renewable energy and other clean technologies, such as those used for energy storage to reduce harmful pollution. Indeed, states' authority under the FPA exceeds that necessary to adopt the ZEC program. Thus, in affirming the district court's conclusion, we urge this Court to avoid language limiting state authority in a manner inconsistent with the FPA and precedent interpreting it.

Under the FPA, states have express authority to regulate utilities and to determine the appropriate energy resource mix as a matter of state law and policy. The Federal Energy Regulatory Commission (FERC), whose

role in the regulation of the electric sector is carefully defined by the FPA, has long recognized states' traditional authority over utility generation and resource portfolios. Supreme Court precedent interpreting FPA jurisdiction leaves ample room for states to act even where such action touches on areas of federal regulation.

Relying on this reserved authority, at least twenty-nine states and the District of Columbia have adopted Renewable Portfolio Standards to achieve state public health and environmental goals.[3] Countless other state programs advance clean energy, reduce harmful pollution, and protect human health and the environment in various additional ways.[4] It is critical that states continue to have the authority to adopt clean energy policies to combat climate change and reduce dangerous pollutants that threaten human health and a livable environment. We urge the Court to employ a

---

[3] *See* Galen Barbose, *U.S. Renewables Portfolio Standards: 2016 Annual Status Report* 5 (Apr. 2016), https://emp.lbl.gov/sites/all/files/documents/lbnl-1005057.pdf

[4] The Database of State Incentives for Renewables & Efficiency compiled by the N.C. Clean Energy Technology Center lists over 600 different state regulatory policies and financial incentives for clean energy technologies. *See* DSIRE, http://www.dsireusa.org (last accessed November 1, 2017).

workable framework for FPA jurisdiction as articulated by the Supreme Court and affirm the district court's ruling that Illinois' ZEC program is not preempted.

Under the dormant Commerce Clause, states similarly retain the right and responsibility to craft critical public policy in furtherance of their citizens' wellbeing. Illinois, acting upon clear and extensive evidence as to the harms associated with air pollution from fossil-fuel generation and the risks of climate change for the state of Illinois, passed the ZEC program to build upon its existing and ongoing efforts to promote low- and zero-polluting generation and protect public health. Plaintiffs' frustrations with the ZEC program's design do not change these legitimate concerns, nor do they form a basis for a dormant Commerce Clause violation.

## ARGUMENT

## I.     The ZEC program is not preempted by the FPA

In enacting the FPA and the analogous Natural Gas Act, "Congress meant to create a comprehensive and effective regulatory scheme of dual state and federal authority." *Fed. Power Comm'n v. La. Power & Light Co.*, 406 U.S. 621, 631 (1972) (quoting *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n*,

332 U.S. 507, 520 (1947)).[5] " . . . [F]ederal jurisdiction was not to be

exclusive," *id.*, but rather "complementary" to state power such that

together they are "comprehensive," and provide for "no gaps," *FERC v.*

*Elec. Power Supply Ass'n*, 136 S. Ct. 760, 780 (2016) (*EPSA*) (quoting *La.*

*Power & Light Co.*, 406 U.S. at 631).

Consistent with this principle, the Supreme Court has interpreted the

FPA in a manner that preserves traditional state authority over the

electricity sector and promotes the ability of regulators to address policy

challenges. The Court's recent decisions in *EPSA* and *ONEOK, Inc. v.*

*Learjet, Inc.*, 135 S. Ct. 1591 (2015) (*ONEOK*), articulate a practical

framework for state and federal regulatory collaboration in the increasingly

integrated energy sector. Later, in *Hughes v. Talen Energy Marketing, LLC*,

136 S. Ct. 1288 (2016), the Supreme Court applied this framework and

---

[5] Although *Louisiana Power & Light* and other cases cited herein involved the Natural Gas Act, not the FPA, "the relevant provisions of the two statutes are analogous," and courts have "routinely relied on [Natural Gas Act] cases in determining the scope of the FPA, and vice versa." *Hughes v. Talen Energy Mktg.*, 136 S. Ct. 1288, 1298 n.10 (2016). FERC administers both laws.

explicitly left room for states to carry out actions like establishing the ZEC program to achieve a desired mix of generating resources.

### A. The FPA preserves states' traditional authority to regulate emissions and other elements associated with electricity generation

The FPA grants FERC jurisdiction over interstate wholesale electricity prices, while states retain jurisdiction over other energy transactions. FERC has the authority to ensure that the "rates" paid "for or in connection with the transmission or sale of electric energy" are "just and reasonable." 16 U.S.C. § 824d(a); *see also id*. § 824e(a).[6] FERC is also authorized "to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *EPSA*, 136 S. Ct. at 774; *see also* 16 U.S.C. §§ 824d(a), 824e(a). States retain jurisdiction over "facilities used for the generation of electric energy," and over "any other sale of electric energy," 16 U.S.C. § 824(b)(1), including retail sales (*i.e.*, sales to end-use customers). *See EPSA*, 136 S. Ct. at 766.

---

[6] The process of reviewing electricity sales prices and determining whether they are just and reasonable is generally described either as "regulating" rates or as "setting" them. *See generally EPSA*, 136 S. Ct. at 767-68.

"[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). Since the dawn of utility regulation, states have exercised their traditional power "to direct the planning and resource decisions of utilities under [the state's] jurisdiction," such as by "order[ing] utilities to purchase renewable generation." *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) (internal quotation marks omitted); *see also Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 86 (2d Cir. 2017) (holding that a Connecticut long-term renewables procurement program is not preempted by the FPA).

States may also direct planning and resource decisions through other means. For example, states may require utilities to purchase Renewable Energy Credits (RECs), which, like ZECs, reflect various attributes of renewable electricity generation that the state deems valuable, separate and apart from its value as electric energy. *See Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008) ("RECs are inventions of state property law . . ."); *Am. Ref-Fuel Co.*, 105 FERC ¶ 61,004,

at P 23 (2003) ("States, in creating RECs, have the power to determine who owns the REC in the initial instance, and how they may be sold or traded").

**B.      The ZEC program falls squarely within state authority**

The ZEC program is a valid use of states' reserved authority under the FPA, it does not disregard FERC's rate-setting decisions, and it is not preempted by federal law. Plaintiffs' claim that ZECs represent a payment "in connection with" a wholesale sale of electric energy, *see* EPSA Br. at 39-41, subject to FERC's exclusive jurisdiction, misinterprets *Hughes*, 136 S. Ct. 1288. ZECs compensate generators for emissions avoidance, are based on production of energy (which causes the avoidance), and are not linked to energy sales. The ZEC program therefore falls squarely within states' traditional authority over generation and environmental regulation.

Plaintiffs have now abandoned a separate argument also rejected by the district court, that the ZEC program is preempted because it is a practice "affecting" FERC-jurisdictional rates. Op. at 33-35. But while that argument is not before the Court, we urge the Court to not accept an incorrect assumption of that argument in affirming the district court:

Contrary to Plaintiffs' assumption, FERC's jurisdiction over practices "affecting" rates is not exclusive.

### 1. ZECs are not payments "for or in connection" with FERC-jurisdictional sales

In arguing that credits received for the generation of electricity under the ZEC program are payments made "in connection with" FERC-jurisdictional sales, Plaintiffs rely upon a comparison between the Illinois ZEC program and the Maryland program that the Supreme Court held was preempted in *Hughes*. *See* EPSA Br. at 41-51. But the analogy does not hold.

Statutory phrases such as "in connection with" require "a non-hyperliteral reading" to be consistent with the FPA's proper scope. *EPSA*, 136 S. Ct. at 774. The Court in *Hughes* found that the Maryland program was preempted due to the combination of several features, none of which are present in the Illinois ZEC program. *Hughes*' conclusion that the payments provided through the Maryland program set rates "for or in connection with" wholesale electricity sales depended on each payment being (1) conditioned on the plant's "clearing" the wholesale market, meaning the plant was required by the state to have made a specific FERC-

jurisdictional wholesale sale, (2) made after and in conjunction with such a sale, *and* (3) structured such that it completely replaced the rate FERC had set for that sale with an entirely different rate set by the state.[7] No unbundled sale of non-electricity attributes (like ZECs or RECs) was involved. Rather the Maryland program "operate[d] within the auction." 136 S. Ct. at 1298. As the Court determined, it re-set the price of the energy itself, pure and simple, in contravention of FERC's exclusive jurisdiction to set rates "for or in connection with" interstate wholesale electricity sales. *Id.* at 1297.

Importantly, this conclusion rested not merely on the payments being conditioned upon clearing in the wholesale market, as suggested by Exelon and State Defendants, *see* Exelon Br. at 2, 27-28; State Defs. Br. at 43-44, but also on the fact that the program provided payments in conjunction with particular sales FERC had already approved, and adjusted the rates for

---

[7] Notably, because *Hughes* addressed payments made in conjunction with specific wholesale sales in the manner outlined above, it is consistent with FERC's *WSPP* decision, which held that RECs sold separately and apart from wholesale electricity are not made "for or in connection with" such sales. *WSPP Inc.*, 139 FERC ¶ 61,061, at PP 23-24 (2012).

those sales so as to override FERC's already approved prices. *See Hughes*, 136 S. Ct. at 1299 ("We reject Maryland's program only because it disregards an interstate wholesale rate required by FERC.")[8]

Unlike Maryland's program in *Hughes*, nothing about the ZEC program set rates "for or in connection with the transmission or sale of electric energy." Once a ZEC generator sells its energy at wholesale auction, that sale price is fixed, unadjusted by any "contract for differences." *Cf. Hughes*, 136 S. Ct. at 1290. The price of ZECs is not tied to any sale, is based on the "Social Cost of Carbon," a number unrelated to market prices, and can be adjusted only downward based on a general

---

[8] The "fatal defect" described by *Hughes*, *id.*, was fatal only in the context of the Maryland program's other features. A market-clearing requirement on its own would not "disregard" a wholesale rate established by FERC. Rather, states have long regulated wholesale purchasing behavior by retail utilities, through integrated resource planning and other mechanisms. *See New York v. FERC*, 535 U.S. 1, 24 (2002) (noting that the FPA does not encroach on states' control over such matters as "integrated resource planning," or "utility buy-side and demand-side decisions"); *see also Allco*, 861 F.3d at 99-100 (distinguishing between state actions that disregard a FERC-approved rate, as in *Hughes*, and state buy-side regulation facilitating contracts that are subject to subsequent FERC review). In affirming the district court's decision, we urge the Court to be careful not to restrict these longstanding state activities through an inappropriate expansion of *Hughes*' holding, which explicitly avoided preempting state regulation of bilateral wholesale transactions that does not disregard FERC rates. *See* 136 S. Ct. at 1295.

index of *projected future* prices. 20 ILCS § 3855/1-75(d-5)(1)(B). FERC has

explained that "if a state chooses to create . . . separate commodities" to

value "environmental externalities," "[these commodities] are not

compensation for capacity and energy." *Cal. Pub. Utilities Comm'n*, 133

FERC ¶ 61,059, at P 31 n. 62 (2010). FERC also held in *WSPP* that

unbundled RECs do not directly affect wholesale rates, much less

constitute a payment "in connection with" a FERC-jurisdictional sale.

*WSPP, Inc.*, 139 FERC ¶ 61,061, at P 24 (2012) ("[T]he charge for the

unbundled RECs is not a charge in connection with a wholesale sale of

electricity.").[9] FERC's decision in *WSPP* evaluated RECs originating from

programs across a range of states, including in regions where then-current

---

[9] While Plaintiffs are correct that WSPP clarified that FERC may have jurisdiction over other products that "directly affect" FERC-jurisdictional rates, they confuse the significance of the decision, which is that FERC determined that the "unbundled" RECs did not "directly affect" FERC-jurisdictional rates *because* "similar[]" to emissions allowances addressed by a prior FERC decision, their "sale or transfer occurs independent of a sale of electric energy for resale in interstate commerce." *Id.* at PP 22-24.

FERC rules mandated that the energy associated with those RECs be sold in wholesale markets.[10]

*Hughes*, a self-described "limited" decision, did not preclude states from considering any information related to wholesale markets when regulating the retail sales and power generation facilities over which they have reserved authority. 136 S. Ct. at 1299; *cf. Rochester Gas & Elec. Corp. v. Pub. Serv. Comm'n of State of N.Y.*, 754 F.2d 99, 103 (2d Cir. 1985) (just as FERC may "take into account activities it cannot regulate in setting rates for activities that it may regulate," so may states "take into account" FERC's regulatory actions in deciding matters within their own jurisdiction).

## 2. In affirming the district court, the Court should reject the assumption that FERC's jurisdiction over practices affecting rates is exclusive

Plaintiffs' now-abandoned argument that the ZEC program constitutes a practice directly affecting rates depended upon an incorrect

---

[10] *See Order Terminating West-Wide Must-Offer Requirements*, 157 FERC ¶ 61,051, at PP 1-3 (2016) (eliminating a must-offer requirement that applied to all generation in the western half of country at the time *WSPP* was decided).

assumption that FERC's jurisdiction over practices directly affecting interstate wholesale rates is exclusive. *EPSA* and *ONEOK* rejected that notion. In affirming the district court, we urge this Court to follow *EPSA* and *ONEOK* and make clear that states and FERC share concurrent jurisdiction over such practices.[11]

Observing that retail and wholesale electricity markets are "inextricably linked" and that a "'[p]latonic ideal' of strict separation between federal and state realms cannot exist," *EPSA*, 136 S. Ct. at 766, 776 (citing *ONEOK*, 135 S. Ct. at 1601), *EPSA* and *ONEOK* set forth a practical approach to determining the FPA's allocation of federal and state authority that provides overlapping authority over many such practices and thereby

---

[11] The district court's statement that "[t]he parties agree that *EPSA* defined FERC's exclusive jurisdiction as that which 'directly affects' the wholesale rate," is incorrect. Op. at 26. While the parties agreed that *EPSA* limited FERC's "affecting" jurisdiction to practices "directly affecting" rates, they disagreed as to whether this jurisdiction is exclusive. *See, e.g.*, Memorandum of Law in Support of Motion to Dismiss of Intervenor Exelon Generation Company, LLC, ECF #37, at 17 ("Fossil Fuel Plaintiffs repeatedly allege that FERC's 'directly affecting' jurisdiction is 'exclusive.' *EPSA* flatly rejects that claim.") (citation omitted). The FPA's "bright line," *see* Exelon Br. at 27, applies to FERC's authority to determine that rates for wholesale sales are just and reasonable, but not to practices directly affecting rates. No Supreme Court opinion has ever held that state regulation of a practice affecting rates (as opposed to directly determining a FERC-jurisdictional rate) was field preempted.

allows regulators to craft workable rules. *EPSA* emphasized the importance of sensible limiting principles when interpreting the FPA: "[I]n addressing" terms like "affecting" or "similar terms like 'relating to' or 'in connection with,' a non-hyperliteral reading is needed to prevent the statute from assuming near-infinite breadth." *EPSA*, 136 S. Ct. at 774. In particular, *EPSA* held that FERC's FPA jurisdiction over rules or practices "affecting" wholesale rates, 16 U.S.C. § 824e(a), was limited to practices that "*directly affect the [wholesale] rate." Id.* (emphasis and bracket in original) (quoting *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004)).

    *EPSA* addressed "demand response," a product that meets energy needs by cutting demand rather than generating more electricity. It held that a FERC rule regulating sales of demand response in wholesale electricity markets was a proper exercise of federal jurisdiction because even though demand response involves cutting retail demand for electricity (an area of traditional state control), the compensation for demand response at issue "directly affect[ed] wholesale prices" and did not "set retail rates." *Id.* at 775, 777.

The Court made clear, however, that FERC's rules were not exclusive and would not preempt non-conflicting state regulation in the same area. FERC's rule compensated demand response in its wholesale markets, but it also gave states a "veto power," "allow[ing] any State regulator to prohibit its consumers from making demand response bids in the wholesale market." *Id.* at 779. The Court observed that this "feature of the Rule . . . removes any conceivable doubt as to [the Rule's] compliance with [Section 201(b) of the FPA's] allocation of federal and state authority." *Id.* at 780. In other words, the FPA promotes, rather than precludes, concurrent regulation by FERC and the states of demand response participation in the wholesale markets, even where it directly affects FERC-jurisdictional rates.

*ONEOK* similarly approved of an overlapping regulatory framework, holding that state antitrust regulatory actions were not preempted under the FPA despite the fact that "FERC has promulgated detailed rules" that "prohibit[] the very kind of anticompetitive conduct that the state actions attack." *ONEOK,* 135 S. Ct. at 1599, 1602-03.

In evaluating state antitrust actions regulating "anticompetitive activities that affected wholesale (as well as retail) rates," *ONEOK* devised a test for evaluating state laws that regulate both "non[-FERC-]jurisdictional as well as [FERC-]jurisdictional sales" in that manner. *Id*. at 1599 (emphasis omitted). Within that specific frame, *ONEOK* explained that the proper test for field preemption where state regulation directly affects a wholesale rate is to focus on "the *target* at which [a] law *aims*," and to invalidate state regulations only where they aim "directly" at regulating in FERC's exclusive wholesale rate-setting sphere. *Id.* at 1599-600.

But this test does *not* apply where a state has acted within its own sphere (such as retail rate-setting or pricing emissions attributes), and therefore by definition has acted within its own domain rather than FERC's. State action in such cases is preempted only if it irreconcilably conflicts with FERC's regulation. *See id.* at 1601 (noting that a prior case addressing such a situation "is best read as a conflict pre-emption case, not a field pre-emption case"). FERC cannot field preempt a core state

regulatory function like retail rate regulation "no matter how direct, or dramatic, its impact on wholesale rates." *EPSA*, 136 S. Ct. at 775.[12]

Even if Plaintiffs were correct in assuming that FERC's jurisdiction over practices directly affecting wholesale rates is exclusive, the ZEC program would not be preempted because it does not directly affect wholesale rates. As FERC held in evaluating RECs, where such credits are sold separately from the electricity itself, they "do not affect or relate to rates and charges for transmission or sale of electric energy" under the FPA. *WSPP Inc.*, 139 FERC ¶ 61,061, at P 9 (2012) (citing 16 U.S.C. § 824d). ZECs, like the RECs that *WSPP* determined fall outside FERC's jurisdiction, are sold separately from wholesale electricity.

### C. Finding the Illinois ZEC program preempted by the FPA would undermine states' clean energy policies

A ruling denying Illinois' authority to enact the ZEC program could jeopardize far more than just the nuclear plants that Illinois is seeking to

---

[12] Even if Plaintiffs were correct that the "aim" test applies, the ZEC program would not be preempted because it aims at emissions avoidance. It does not aim at wholesale energy or capacity sales.

preserve: It would cast a pall of uncertainty over a wide range of

longstanding and effective efforts states have traditionally employed to

promote the use of clean energy and further the welfare and wellbeing of

their citizens.

Plaintiffs concede that REC programs are not preempted under

*Hughes*. *See* EPSA Br. at 51-52 ("RECs do not set wholesale rates" and

therefore "lack . . . . the 'fatal defect'" in *Hughes*). It follows from this

concession that Plaintiffs' broad arguments against Illinois' ZEC program

must also fail.

Like ZECs, RPS programs and virtually all other state policies

indirectly affect wholesale energy market prices. As both district courts

evaluating ZEC programs found, "any effects exerted by ZECs on the

market auctions are indirect and incidental; those effects do not cause the

sort of 'clear damage to federal goals,' that would give rise to a claim of

conflict preemption." *Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, No.

16-CV-8164 (VEC), 2017 WL 3172866, at *16 (S.D.N.Y. July 25, 2017)

(quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493,

522 (1989)); *see also* Op. at 34-35. To hold otherwise would give the FPA near-infinite preemptive scope.

Like ZECs, nearly all RPS programs and generation-based tax credits depend upon the production of electricity from the relevant facilities. Such a condition is necessary in order to drive the emissions and other public policy outcomes desired by states. To hold that payments conditioned upon production are preempted would effectively neutralize states' important role in determining the generation mix, a role preserved by the FPA.

Like ZECs, RPS programs and other renewables policies operate under the backdrop of FERC's rules regarding wholesale market participation. To hold that a program could be preempted by a decision by *FERC* to require a generator to sell its production into the wholesale markets (as was required for generators covered by the *WSPP* decision, for example),[13] would place virtually all state programs at the mercy of federal

---

[13] *See supra* note 10.

regulators and upset states and FERC's settled understanding of the FPA's careful apportionment of overlapping energy regulatory authority between them. Indeed, when PJM introduced its voluntary must-offer requirement in 2006,[14] states supported the decision, which was understood to have no bearing on the validity of the many then-existing state RPSs in the PJM region.[15]

Plaintiffs' apparent unwillingness to grasp the internal inconsistency of their own arguments illustrates the complexity of the energy sector and the degree to which their sweeping preemption arguments could, if accepted, do violence to vital energy and environmental policies. Even a decision grounded in Plaintiffs' remaining and narrowest argument, based on the ZEC program's retail consumer price control feature, would sow immense confusion for states in carrying out their regulatory role. As described above, this feature adjusts ZEC prices, not wholesale rates, and

---

[14] *See PJM Interconnection, LLC*, 115 FERC ¶ 61,079, P 115 (2006).

[15] *See* 73 Pa. Cons. Stat. § 1648.3 (enacted 2004); N.J. Admin. Code. § 14:8-2.8 (effective 2004); Md. Pub. Utils. Code Ann. § 7-701 *et seq*. (enacted 2004); Del. Code Ann. 26 § 351 *et seq*. (enacted 2005); D.C. Code § 34-1431 *et seq*. (enacted 2005).

pushes them only down and not up, based on composite price forecasts but not actual sales.

In contrast to the clear line drawn by *EPSA* and *Hughes* prohibiting only rate setting in the "most prosaic, garden-variety sense," Plaintiffs' suggestion that a program which includes a Price Adjustment mechanism based on *forecasts* is impermissible greatly overreads *Hughes* (*see supra* I.B.1). Plaintiffs' theory, moreover, has no tenable limiting principle, prompting legal uncertainty surrounding the scope of preemption that could impair market trust in a broad range of established and lawful state programs.

Below, we provide the Court with background on the wide range of lawful programs. We urge the Court to take care not to jeopardize these programs in affirming the district court. State policies to advance clean energy technologies like onshore and offshore wind, solar, and energy storage, take a wide variety of forms. Even within the narrow category of REC-based RPS programs, there is wide variation. *See Allco*, 861 F.3d at 93

("different states define RECs differently, focusing on various attributes which they deem to be especially relevant.").[16]

Plaintiffs' assertion that "REC prices are essentially determined by supply and demand of renewable energy," EPSA Br. at 52, overlooks the many RPS programs which include cost control measures. For programs that use RECs, one approach to cap prices is to permit the use of Alternative Compliance Payments (ACPs) in lieu of buying RECs. ACP pricing methodologies vary, and include fixed statutory prices,[17] or linkage to a percentage of REC value[18] (which may vary based on revenues generators recover from wholesale markets[19]). Other programs control

---

[16] *U.S. Renewables Portfolio Standards: 2016 Annual Status Report*, *supra* note 3, at 6 (detailing "major variations across states" in RPS design). The Center for Robust Decisionmaking on Climate and Energy Policy has developed a portal that summarizes certain features of many different state RPS policies, available at http://rpscalc.rdcep.org/.

[17] *See, e.g.*, 225 Mass. Code Regs. 14.08; 65-407 Me. Code R. Ch. 311, § 3 (setting a fixed rate pursuant to Maine's RPS statute, Me. Rev. Stat.Ann. Tit. 35-A, §3210(9)(A), setting factors on which the Maine Public Utilities Commission must base the price).

[18] *See, e.g.*, 73 Pa. Stat. Ann. § 1648.3(f)(4) (setting a solar-specific ACP at 200% the value of solar RECs).

[19] REC prices are generally dictated in part by the cost of producing environmental benefits from eligible renewable generators. Depending on the RPS structure in a given

costs by limiting total REC payments to a certain percentage of a utility's revenues,[20] retail rates,[21] bills,[22] or wholesale energy procurement costs,[23] or by allowing a utility to forego purchasing energy from a renewable facility where the costs exceed those of procurement from another resource by a specified percentage.[24] States also use their traditional authority to determine the prudence of bundled wholesale contracts when those costs are passed on to retail customers, and exempt utilities from obligations where contracts are not prudent.[25]

While many RPS programs and other state policies foster new renewable generators, they can also be concerned with preserving existing

---

state, a generator earning more revenue in the wholesale markets may be able to offer REC sales at lower prices because it needs less money to cover the costs of production.

[20] *See, e.g.*, N.M. Admin. Code § 17.9.572.12.

[21] *See, e.g.*, Kan. Admin. Regs. 82-16; Mo. Rev. Stat. § 393.1030(2)(1).

[22] *See, e.g.*, Colo. Rev. Stat. § 40-2-124(1)(g).

[23] *See, e.g.*, 26 Del. Code Regs. § 363(f); Ohio Rev. Code Ann. § 4928.64(C)(3).

[24] *See* Mont. Code Ann. §69-3-2007(2).

[25] *See* Nev. Rev. Stat. Ann. § 704.7821(2)(c), (6), (7) (providing for review of contracts); *see also Ky. W. Va. Gas Co. v. Pa. Publ. Util. Comm'n*, 837 F.2d 600 (3d Cir. 1988) (affirming states' authority to review contracts for prudence in regulating retail rates).

renewable generators that would otherwise retire or deliver their benefits

elsewhere.[26] RPS programs may provide different levels of support to

different technologies (providing greater support to emerging technologies

that are less commercially viable, for example),[27] and states may select

eligible REC participants through Requests for Proposals.[28]

RPS programs are not limited to creating RECs. Many facilitate the

entry into long-term power purchase agreements, such as Connecticut's

program recently determined by the Court of Appeals for the Second

Circuit to be in compliance with the FPA. *See Allco*, 861 F.3d at 96-103.

---

[26] *See* Order Adopting a Clean Energy Standard at 115, No. 15-E-0302 (N.Y. P.S.C. Aug. 1, 2016) (creating a separate tier for certain renewable generators because "[c]oncern was also expressed that . . . the clean energy attributes of certain small hydroelectric facilities . . . would be at risk because the facilities might fail financially and retire for the lack of sufficient overall revenues."); *see also* Edward Holt, Clean Energy States Alliance, CESA State RPS Policy Report: Increasing Coordination and Uniformity Among State Renewable Portfolio Standards 9 (2008) (explaining that state RPS requirements can vary based on whether the state has "a desire to support existing resources"), available at http://www.cesa.org/assets/Uploads/Resources-pre-8-16/CESA-Holt-RPS-policy-report-dec2008.pdf.

[27] *See, e.g.*, N.J. Rev. Stat. Ann. § 48:3-87 (providing a separate requirement for "solar electric power generators").

[28] *See Allco*, 861 F.3d 82 (evaluating such a program).

Similar frameworks will likely prove particularly effective at catalyzing offshore wind and energy storage technologies.[29]

Maintaining clear jurisdictional boundaries by using the framework set forth by *ONEOK*, *EPSA*, and *Hughes*, is particularly important because it permits state and federal regulators to work together to efficiently reach their respective goals. For example, the New York Department of Public Service and New York Independent System Operator (NYISO) are currently exploring options for factoring in the cost of carbon emissions when determining generator dispatch. Doing so requires a clear understanding that New York is responsible for articulating emissions policy through defining the cost of carbon, for example, with NYISO facilitating efficient energy market prices in light of that policy.[30] These

---

[29] California and Massachusetts, for example, have both adopted energy storage procurement mandates. *See* Cal. Pub. Util. Code § 2836-2837; An Act Relative to Energy Diversity, Chapter 188 of the Acts of 2016 § 15(b), *available at* https://malegislature.gov/Laws/SessionLaws/Acts/2016/Chapter188 (which directs DOER to consider a storage target).

[30] *See* Pricing Carbon Into NYISO's Wholesale Energy Market to Support New York's Decarbonization Goals at 28-29 (2017), *available at* http://www.nyiso.com/public/webdocs/markets_operations/documents/Studies_and_R

discussions could be curtailed, however, by a decision calling those jurisdictional roles into question.

Indeed, anything but a decision affirming the district court and carefully avoiding restricting state authority could create a regulatory no-man's-land. States may be reluctant to adopt measures promoting clean energy and protecting citizens' health and environment for fear of preemption, and FERC may be reluctant to do the same for fear of expanding the preemptive scope of its policies. The FPA was designed to avoid such a jurisdictional gap. As the *EPSA* Court observed, Congress's "precise[]" intent was to "to eliminate vacuums of authority over the electricity markets." 136 S. Ct. at 780. The Illinois ZEC program is a permissible use of the States' reserved authority under the FPA, and we urge the Court to affirm the district court's judgment upholding the program.

---

eports/Studies/Market_Studies/Pricing_Carbon_into_NYISOs_Wholesale_Energy_Mark
et.pdf.

## II. The ZEC program does not violate the dormant Commerce Clause

States have longstanding authority to craft policies that further environmental and public health goals. State policies aimed at improving air quality, environment, and human health through cleaner energy are classic exercises of this authority. Courts have rejected dormant Commerce Clause challenges in this area as thinly-veiled attempts to second guess state policy.[31] The Commerce Clause does not restrict the use of state authority to regulate emissions in the manner Illinois has done here.

### A. States have longstanding authority to address environmental and public health risks, including those related to energy

The dormant Commerce Clause is principally driven "by concern about 'economic protectionism - that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Rev. of Ky. v. Davis*, 553 U.S. 328, 338-39 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1983)). It does not extinguish the states' right and responsibility, with "great latitude under their police

---

[31] *See, e.g. Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015) (Gorsuch, J.); *Allco*, 861 F.3d at 107-108.

powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (internal quotation marks omitted).

Illinois has a long history of furthering its citizens' welfare through crafting environmental and public health policies.[32] Illinois' purpose in enacting the FEJA and the ZEC program was to build upon these important state efforts. The law is designed to combat well-founded environmental concerns, with a critical focus on protecting public health. The General Assembly found that in order to achieve its environmental goals, Illinois needed to expand its commitment to zero emission energy generation. It stated that preserving existing zero emission energy generation and promoting new zero emission energy generation "is vital to placing the State on a glide path to achieving its environmental goals and ensuring that

---

[32] *See e.g.* S.B. 1652, Energy Infrastructure Modernization Act, Pub. Act 97-0616 (Ill. 2011) (Illinois law encouraging innovative solutions to protect the state's environment, human health, and ratepayer); *See e.g.* Arthur C. Stern, *History of Air Pollution Legislation in the United States*, 32 J. Air Pollution Control Ass'n 44, 44 (1982) (Chicago passed the nation's first municipal air pollution regulation).

air quality in Illinois continues to improve." S.B. 2814, Future Energy Jobs Act, Pub. Act 99-0906, § 1.5(3), (4) (Ill. 2016).

The validity of the state's objective is strengthened and informed by the robust body of evidence, technical analysis, and scientific study that makes clear the acute nature of Illinois' concern about the effects of pollution and climate change.[33] The ZEC program is designed in response to this critical concern. The statute directs the Illinois Power Agency to create a procurement plan for ZECs based upon "public interest criteria

---

[33] *See* R. Frankson, K. Kunkel, S. Champion, B. Stewart, D. Easterling, B. Hall, and J. R. Angel, *Illinois State Summary*, NOAA Technical Report, NESDIS 149-IL, 4 (2017) (climate change has the potential to cause great damage to Illinois and its citizens), available at https://statesummaries.ncics.org/sites/default/files/downloads/IL-screen-hi.pdf; Envtl. Prot. Agency, *What Climate Change Means For Illinois*, EPA 430-F-16-015 (Aug. 2016) (noting that, in addition to the adverse effects of storm and flood water runoff, warmer temperatures are also projected to affect water quality), available at https://19january2017snapshot.epa.gov/sites/production/files/2016-09/documents/climate-change-il.pdf; Chicago Climate Action Plan, *Climate Change and Chicago, Chapter 4: Health* 8 (Nov. 7, 2007), available at http://www.chicagoclimateaction.org/filebin/pdf/report/Chicago_climate_impacts_report_Chapter_Four_Health.pdf (finding "under the higher emission scenario [the status quo model] . . . the average summer mortality rate for *each year* is expected to be similar to that during the actual heat wave in 1995 [697 heat-related deaths in Cook County with a population of 6.07 million] and by the end of the century the average mortality rate is projected to be almost twice that."); *see generally*, *Potential Nuclear Power Plant Closings in lllinois* (Jan. 5, 2016), available at http://www.ilga.gov/reports/special/Report_Potential%20Nuclear%20Power%20Plant%20Closings%20in%20IL.pdf.

that include, but are not limited to, minimizing carbon dioxide emissions

that result from electricity consumed in Illinois and minimizing sulfur

dioxide, nitrogen oxide, and particulate matter emissions that adversely

affect the citizens of this State." 20 ILCS 3855/1-75(d-5)(1)(C). This is

expressly designed to protect Illinois citizens from the health impacts of

harmful air pollution and climate change. These are legitimate and non-

discriminatory objectives. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.5.

456 (1981) (upholding geographically neutral environmental regulation

even though in-state industry incidentally benefited).

Plaintiffs complain that FEJA's procurement process "is foreordained

. . . because it can only come out in favor of the Exelon plants," and that the

program is thus sub-rosa protectionism. EPSA Br. at 65. On a facial

challenge to a state law, however, a court should "assume that the

objectives articulated by the legislature are actual purposes of the statute,

unless an examination of the circumstances forces [the court] to conclude

that they could not have been a goal of the legislation." *Clover Leaf*

*Creamery*, 449 U.S. at 463 n.7 (internal quotation marks omitted). Plaintiffs

have not demonstrated that Illinois' legitimate concerns about emissions from energy generation "could not have been" a goal of FEJA, and we urge the Court not to imperil Illinois' traditional legislative authority based on Plaintiffs' conjecture about how FEJA's procurement process will proceed.

Plaintiffs' contention that the ZEC program discriminates against interstate commerce "in effect" by "propping up the in-state Exelon plants via a distortion of the interstate energy market," EPSA Br. 65, does not advance their dormant Commerce Clause claim, either. The ZEC program, as set forth in FEJA, is based on environmental criteria and does not select generators based on their geographical location. Even crediting Plaintiffs' assertion that in-state generators are more likely to qualify for ZEC payments, a simple difference in the effect of a law on in-state and out-of-state businesses does not render a state law unconstitutional. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978); *see also Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995).

**B. The dormant Commerce Clause is not a license to second-guess legitimate state policy designs**

The Supreme Court has long recognized the importance of deference to democratically-elected State Legislatures in making policy decisions, and noted that the dormant Commerce Clause is not a "roving license" to question their policy judgments. The dormant Commerce Clause "does not elevate free trade above all other values," *Maine v. Taylor*, 477 U.S. 131, 151 (1986), nor does it protect "the particular structure or methods of operation" of a particular market. *Exxon Corp.*, 437 U.S. at 127.

Plaintiffs' preference for alternative designs should have no bearing upon a dormant Commerce Clause analysis. The ZEC program is focused specifically upon zero-carbon attributes from nuclear facilities. FEJA includes a number of other important programs designed to further clean energy resources. Embedded throughout the law, however, is the common goal: to protect public health and the environment.

This goal could be designed and implemented through a variety of differing mechanisms; the legitimate choice Illinois made here, however, does not offend the dormant Commerce Clause. That doctrine does not

impose a "broad[], all-weather, be-reasonable vision of the Constitution." *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 505 (7th Cir. 1989). Plaintiffs view Illinois' decision to create ZECs as a market distortion that will prop up inefficient generators. EPSA Br. 65. But Illinois, like all states, enjoys great flexibility in responding to problems of public policy, *see Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1132, and the Commerce Clause does not enact Plaintiffs' preferred concept of efficiency. Minimizing carbon dioxide, sulfur dioxide, nitrogen oxides, and particulate matter emissions are entirely valid purposes for the Illinois legislature. The legislature has the discretion to choose the policy mechanisms to achieve those ends.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: November 3, 2017                Respectfully submitted,

<u>/s/Thomas Zimpleman</u>               Kristin Munsch
Thomas Zimpleman                     Deputy Director
Natural Resources Defense Council    Citizens Utility Board
1152 15th St. NW, Suite 300          309 W. Washington St., Suite 800
Washington, DC 20005                 Chicago, IL 60606
(202) 513-6244                       (312) 263-4282
tzimpleman@nrdc.org                  kmunsch@citizensutilityboard.org
                                     *Counsel for amicus curiae Citizens*
                                     *Utility Board*
Miles Farmer
Natural Resources Defense Council
40 W. 20th St.                       Anne McKibbin
New York, NY 10011                   Policy Director
(212) 727-4634                       Elevate Energy
*Counsel for amicus curiae*          322 S. Green St., Suite 300
*Natural Resources Defense Council*  Chicago, IL  60607
                                     (773) 269-2225
Michael Panfil                       Anne.McKibbin@ElevateEnergy.org
Environmental Defense Fund           *Counsel for amicus curiae Elevate*
1875 Connecticut Ave., NW            *Energy*
Washington, DC 20009
(202) 572-3280                       Joel J. Africk
mpanfil@edf.org                      Respiratory Health Association
*Counsel for amicus curiae*          1440 W. Washington St.
*Environmental Defense Fund*         Chicago, Illinois 60607
                                     (312) 243-2000
                                     jafrick@lungchicago.org
                                     *Counsel for amicus curiae Respiratory*
                                     *Health Association*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P.29(a)(5) because this brief contains 6,911 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This certificate was prepared in reliance on the word count function of Microsoft Office Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14 point Palatino Linotype font for the main text and 12 point Palatino Linotype font for footnotes.

Dated: November 3, 2017                        /s/ Thomas Zimpleman
                                               Thomas Zimpleman

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 3, 2017, I caused the

foregoing to be filed electronically with the Clerk of the Court using the

CM/ECF system, which will send a Notice of Electronic Filing to all

counsel of record.

/s/ Thomas Zimpleman
Thomas Zimpleman
*Counsel for Amici Curiae*
