# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

————

VILLAGE OF OLD MILL CREEK, ET AL.,
*Plaintiffs-Appellants,*

v.

ANTHONY M. STAR, ET AL.,
*Defendants-Respondents.*

————

ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, NOS. 1:17-CV-01163 & 1:17-CV-01164, HON. MANISH S. SHAH, DISTRICT JUDGE

————

## BRIEF FOR THE UNITED STATES AND THE FEDERAL ENERGY REGULATORY COMMISSION AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-RESPONDENTS AND AFFIRMANCE

————

JAMES P. DANLY
*General Counsel*

DAVID L. MORENOFF
*Deputy General Counsel*

ROBERT H. SOLOMON
*Solicitor*

ANAND R. VISWANATHAN
*Attorney*

Federal Energy Regulatory
    Commission
888 First Street, NE
Washington, DC 20426
(202) 502-8236

JEFFREY H. WOOD
*Acting Assistant Attorney General*

ERIC GRANT
*Deputy Assistant Attorney General*

JENNIFER S. NEUMANN
MATTHEW R. OAKES
ROBERT J. LUNDMAN

Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7415
Washington, DC 20044
(202) 514-2496
robert.lundman@usdoj.gov

# TABLE OF CONTENTS

INTEREST OF THE AMICI CURIAE ...................................................... 1

BACKGROUND… ............................................................................ 2

SUMMARY OF ARGUMENT ............................................................. 7

ARGUMENT…….............................................................................. 9

I.   The District Court Decision Not To Preempt The Illinois
     Statute Is Correct As A Matter Of Law ........................................ 9

     A.   The Illinois Program Does Not Suffer From the
          "Fatal Defect" That Rendered the Maryland Program
          Unacceptable In *Hughes*. ...................................................... 9

     B.   Hughes Recognizes the Ability of States To Craft
          Policy Initiatives In Ways That Will Avoid
          Federal Preemption ............................................................... 16

II.  The Illinois Statute Does Not Impede The Commission's
     Statutory Ability To Regulate The Wholesale Markets. ........... 19

III. The Commission Has Previously Found That Certain State
     Progams Supporting Clean Power Are Not Within Its
     Jurisdiction Over Wholesale Rates………................................... 22

CONCLUSION  ............................................................................. 27

# TABLE OF AUTHORITIES

## COURT CASES:

*Allco Fin. Ltd. v. Klee,*
    861 F.3d 82 (2d Cir. 2017) ...................................................... 14, 18, 20

*Coal. For Competitive Elec. v. Zibelman,*
    272 F. Supp. 3d 554 (S.D.N.Y. 2017) ........................................... 12, 13

*FERC v. Elec. Power Supply Ass'n,*
    136 S. Ct. 760 (2016) ............................................................. 13, 19, 24

*Hughes v. Talen Energy Marketing, L.L.C.,*
    136 S. Ct. 1288 (2016) ........................ 5, 7, 8, 9, 12, 13, 14, 15, 16, 20

*Illinois ex rel. Greenblatt v. Commonwealth Edison Co.,*
    No. 11 C 2009, 2011 WL 2550834 (N.D. Ill. June 27, 2011) ........... 25

*N.J. Bd. of Pub. Utils. v. FERC,*
    744 F.3d 74 (3d Cir. 2014) ................................................................ 17

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.,*
    489 U.S. 493 (1989) ......................................................................... 18

*Oneok, Inc. v. Learjet, Inc.,*
    135 S. Ct. 1591 (2015) .................................................................. 7, 18

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. Dep't of Mental Health,*
    699 F.3d 962 (7th Cir. 2012) .............................................................. 2

*PPL Energyplus, LLC v. Solomon,*
    766 F.3d 241 (3rd Cir. 2014) ............................................................ 17

# TABLE OF AUTHORITIES

**COURT CASES:**

*Union Pac. R.R. Co. v. Chi. Transit Auth.,*
    647 F.3d 675 (7th Cir. 2011) ............................................................ 13

*Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control,*
    531 F.3d 183 (2d Cir. 2008) .................................................... 23

**ADMINISTRATIVE CASES:**

*Cal. Indep. Sys. Operator Corp.,*
    119 FERC ¶ 61,061 (2007) .................................................... 26

*Cal. Pub. Utils. Comm'n,*
    132 FERC ¶ 61,047 (2010) .................................................... 25

*Cal. Pub. Utils. Comm'n,*
    133 FERC ¶ 61,059 (2010) .................................................... 26

*Conn. Light & Power Co.,*
    70 FERC ¶ 61,012 (1995) .................................................... 25

*Edison Elec. Inst.,*
    69 FERC ¶ 61,344 (1994) .................................................... 24

*ISO New England Inc.,*
    162 FERC ¶ 61,205 (2018) ........................................... 5-6, 21

*ISO New England Inc.,*
    158 FERC ¶ 61,138 (2017) .................................................... 21

*Midwest Power Sys., Inc.,*
    78 FERC ¶ 61,067 (1997) .......................................... 25, 26

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**

*So. Cal. Edison,*
    71 FERC ¶ 61,269 (1995) .................................................................. 26

*WSPP Inc.,*
    139 FERC ¶ 61,011 (2012) ...............................................10, 23, 24, 25

**STATUTES:**

Federal Power Act:

    Section 201(b)(1), 16 U.S.C. § 824(b)(1) .............................................. 8

    Section 205, 16 U.S.C. § 824d ............................................................ 24

    Section 206, 16 U.S.C. § 824e ............................................................. 4

    Section 313, 16 U.S.C. § 825*l*......................................................6, 8, 22

# GLOSSARY

A.                                       Cites to Appellants' Joint Appendix

Appellants Br.                Brief of Appellants Electric Power Supply Association, *et al.*, No. 17-2445

Calpine Compl.              *Calpine Corp. v. PJM Interconnection, L.L.C.*, FERC Docket No. EL16-49 (Amended Complaint filed Jan. 9, 2017)

Commission or FERC     Federal Energy Regulatory Commission

New England Order        *ISO New England Inc.*, 162 FERC ¶ 61,205 (Mar. 9, 2018)

Op.                                 July 14, 2017 opinion of the Northern District of Illinois granting motions to dismiss

P                                     The internal paragraph number within a FERC order

PJM                             PJM Interconnection, L.L.C., operator of the regional grid in 13 states and the District of Columbia

## INTEREST OF THE AMICI CURIAE

These consolidated cases concern whether the Federal Power Act, 16 U.S.C. § 791a *et seq.*, preempts an Illinois law that requires electric-distribution companies to pay subsidies to state-selected "zero emission facilities" based on the amount of electricity these facilities generate. The United States and the Federal Energy Regulatory Commission ("Commission" or "FERC") submit this brief as amici curiae in response to this Court's February 21, 2018 order inviting the United States to express the views of the government in these consolidated cases. *See, e.g.,* Oral Argument at 3:01-3:07 (7th Cir. Jan. 3, 2018) (No. 17-2433 *et al.*) (asking appellants' counsel whether FERC believes the Illinois program interferes with FERC procedures); *id.* at 13:35-13:39 ("[Y]ou're asking us, effectively, to predict that the FERC will do something.").

Because these cases directly implicate the Commission's regulatory responsibilities, the United States has a substantial interest in the Court's resolution of the preemption issue. Amici take no position on whether Appellants have an equitable or statutory cause of action, or on the dormant commerce clause issue presented by the parties in this appeal. The United States notes that the Court need not

address the cause-of-action issue if it concludes that the Federal Power Act does not preempt the Illinois program. *See Planned Parenthood of Ind., Inc v. Comm'r of Ind. Dep't of Mental Health*, 699 F.3d 962, 983-84 (7th Cir. 2012) (assuming without deciding that a right of action exists and deciding that preemption claims fails on the merits).

## BACKGROUND

The subsidy at issue here is a creature of an Illinois statute, the "Future Energy Jobs Act." That law requires utilities to buy "zero emission credits" or "ZECs" from certain qualifying electricity generators. *See* Op. 1-2, 7-8. ZECs represent the environmental attributes of one megawatt hour of electricity produced from a zero-emission facility. *Id.* 7.

The price for each ZEC is the Social Cost of Carbon, $16.50 per megawatt-hour, as determined by a federal interagency working group. *Id.* 8 & n.11; A.194 (Illinois statute). That price may go down if a "market price index" (i.e., a benchmark price composed of projected energy market prices and average capacity market prices) is higher than $31.40 (i.e., the "baseline market price index"). Op. 8-9 & n.11-12; A.194-95. The baseline market price index is an amalgamation of

average energy prices for a 12-month period ending May 31, 2016 at a single location in the PJM regional market[1] and average capacity market prices in the two Illinois regional markets. *See* Op. 9 n.13; A.195. The price adjustment provision was intended "to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase." Op. 9 (quoting 20 ILCS 3855/1-75(d-5)(1)(B)).

The Illinois Power Agency confers ZECs on facilities "'reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16 [percent] of the actual amount of electricity delivered by each electric utility to retail customers in the State during calendar year 2014.'" *Id.* 7-8 (quoting 20 ILCS 3855/1-75(d-5)(1)); *see also id.* 2, 6-7 (noting that two nuclear power plants owned by Exelon in Illinois, Clinton and Quad Cities, are likely to qualify for ZECs).

---

[1] PJM Interconnection, L.L.C. ("PJM") is a non-profit entity that operates the high-voltage electric transmission network in the mid-Atlantic region and manages the country's largest competitive wholesale electricity market. It was named after the smaller Pennsylvania-New Jersey-Maryland region in which it first operated.

The district court recognized, and the parties do not appear to dispute, that the Illinois statute does not require participation in FERC-jurisdictional wholesale auctions as a prerequisite to receive ZECs. *See* Op. 30; Appellants Br. 44, No. 17-2445 (Illinois statute "does not expressly mandate participation in the auctions as a condition of receiving the ZEC."); *see also* Exelon Br. 3; State Appellees Br. 15, 45; Rather, ZECs are available to generators regardless of whether they clear the wholesale auctions. Op. 30-31; *see also id.* 10, 32 (generators receive ZECs "for each megawatt hour of electricity they produce" and "the credits are not directly conditioned on clearing wholesale auctions"); *Calpine Corp. v. PJM Interconnection, L.L.C.*, FERC Docket No. EL16-49, Amended Compl. at 12 (filed Jan. 9, 2017) ("Calpine Compl.") (stating that ZEC "payments are tied to energy production").

Several of the plaintiffs in the federal lawsuit now before this Court concurrently filed a related complaint at FERC (Docket No. EL16-49). In that pending proceeding, they challenged the so-called "minimum offer price rule" issued by PJM as unjust and unreasonable, under section 206 of the Federal Power Act, 16 U.S.C. § 824e. Calpine Compl. at 1-3. PJM issued the rule and submitted it to the Commission

for approval as part of the Commission's "extensive[]" regulation of auctions of "capacity" administered by the various regional grid operators. *See Hughes v. Talen Energy Marketing, L.L.C.*, 136 S. Ct. 1288, 1293 (2016) (capacity auctions administered by regional market operators "ensure the availability of an adequate supply of power at some point far in the future"). It is intended to prevent inappropriate suppression of market clearing prices and requires generators meeting specified criteria to submit bids above a price specified by the regional operator (also referred to as an "offer floor"). *See id.* at 1294.

In complainants' view, PJM's minimum-offer-price rule failed to address the "price suppressive" effect of resources that benefit from subsidies awarded by state retail regulators, one of which was the Illinois ZEC program. *See* Calpine Compl. at 6, 18. To correct that effect on wholesale capacity prices, they sought expansion of the rule to cover recipients of state subsidies (including ZECs). *See id.* at 2-3; *see also id.* at 13 ("State-approved subsidies that, by design, interfere with economic signals for entry and exit represent an existential threat to organized wholesale markets that are the centerpiece of the Commission's pro-competitive regulatory approach."); *see also ISO New*

*England Inc.*, 162 FERC ¶ 61,205, at PP 4, 6, 9, 22 (2018) ("New England Order") (approving New England Independent System Operator's proposal to allow certain state-supported resources to obtain wholesale capacity supply obligations so long as the resources' market entry is coordinated with the market exit of an equal quantity of retiring capacity).

Though the Calpine Complaint contended that the Illinois law was preempted, it stated that "[a]ny preemption claims related to the ZECs Legislation . . . would be properly adjudicated in federal district court, and the Commission need not and, indeed, should not, address preemption questions in this proceeding." *See* Calpine Compl. at 11 n.46 (internal citations omitted).

This administrative proceeding is still ongoing. After the Commission issues an order, any aggrieved party may seek rehearing before the agency, 16 U.S.C. § 825*l*(a). The Commission, accordingly, expresses no statement in this brief as to whether the PJM minimum offer price rule requires correction to address state initiatives such as the Illinois ZEC program. It and the United States submit this brief to express the federal government's views on the preemption issue

addressed by the district court,[2] and to describe FERC's past treatment of various forms of state support for renewable resources.

## SUMMARY OF ARGUMENT

The Illinois program is not preempted. It does not require participation in FERC-jurisdictional wholesale auctions as a precondition to receive ZECs. Rather, the Illinois ZEC is "targeted" at an attribute of generation resources over which Illinois has regulatory authority; any spillover, indirect effect on wholesale electricity markets over which the Commission has authority does not warrant preemption. *See, e.g., Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015). Thus it lacks the "fatal defect" that undid the Maryland program in *Hughes v. Talen Energy Marketing, L.L.C.*, 136 S. Ct. 1288 (2016), and the district court's decision was correct as a matter of law.

The Commission's existing statutory authority ensures its ability to ameliorate, as needed, detrimental effects on markets within its jurisdiction. The Federal Power Act assigns the Commission responsibility over interstate wholesale electricity sales, while it

---

[2] *See, e.g.*, Oral Argument at 3:01-3:07 (asking whether FERC believes the Illinois program interferes with FERC procedures).

preserves the traditional authority of States over "any other sale," e.g., retail sales, and over "facilities used for the generation" of electricity. 16 U.S.C. § 824(b)(1); *Hughes*, 136 S. Ct. at 1292. The Commission is familiar with the challenge of regulating the wholesale markets while respecting that statutory division of federal/state authority and addressing, as necessary, effects of state initiatives on those markets.

If the Illinois program, in fact, impairs the functioning of the wholesale markets subject to FERC jurisdiction, the Commission thus has the means and the authority to confront those effects. The Commission is now considering the impacts on wholesale markets of these sorts of programs. Once it issues a final order in the above-noted administrative proceeding, any aggrieved parties will have the opportunity to seek judicial review. *See* 16 U.S.C. § 825*l*. At that time, a court of appeals can resolve any claims properly preserved for judicial review, such as the Commission's analysis of the effect of the Illinois program on federally-regulated wholesale markets or whether the Commission impermissibly encroached on an area reserved for the States.

# ARGUMENT

I.  **The District Court Decision Not To Preempt The Illinois Statute Is Correct As A Matter Of Law.**

A.  **The Illinois Program Does Not Suffer From the "Fatal Defect" That Rendered the Maryland Program Unacceptable In *Hughes.***

In *Hughes*, the Supreme Court concluded that a Maryland subsidy program was preempted because it impermissibly "set[] an interstate wholesale rate, contravening the [Federal Power Act's] division of authority between state and federal regulators." 136 S. Ct. at 1297. The Maryland program obligated load-serving entities to enter into "contracts for differences" with certain generators. And the program required generators to participate in the PJM wholesale capacity auction and guaranteed a subsidy representing the difference between the contract price and market price—so long as the generators bid into and cleared the auction. *See id.* at 1295. Because the program conditioned that subsidy on generators' participation in the wholesale auction (bidding and clearing requirement), while promising a rate distinct from the wholesale market price, the Court found that it "adjust[ed] the interstate wholesale rate" and, accordingly, was preempted. *Id.* at 1297.

Here, the district court correctly found that Illinois imposed no such condition on ZECs. *See* Op. 30.  Generators may receive ZECs even if they do not clear the capacity auctions conducted by the two FERC-jurisdictional market operators in Illinois, PJM and Midcontinent Independent System Operator, Inc. *See id.* 30-31.  The ZECs are separate commodities that represent the environmental attributes of a particular form of power generation; they are not payments for, or otherwise bundled with, sales of energy or capacity at wholesale, and thereby fall outside of FERC's exclusive jurisdiction over wholesale transactions.  *See, e.g.*, *WSPP Inc.*, 139 FERC ¶ 61,011, at PP 23-24 (2012) (state-created "renewable energy credits" that were "unbundled" from and independent of a wholesale energy transaction do not fall within the Commission's statutory jurisdiction).  In these circumstances, the object of the subsidy is the "participant," not the "actual wholesale transaction." *See* Op. 32.  The district court thus properly concluded that the ZEC program "falls within Illinois's reserved authority over generation facilities," and that Illinois "has sufficiently separated ZECs from wholesale transactions such that the Federal Power Act does not preempt the state program." *Id.* 33.

Critically, the parties do not appear to dispute the statute's lack of an auction-clearing requirement. *See* Appellants Br. 44, No. 17-2445 (Illinois statute "does not expressly mandate participation in the auctions as a condition of receiving the ZEC."); *see also* Exelon Br. 3; State Appellees Br. 15, 45. As one of the complaints filed in the district court admitted, the Clinton and Quad Cities plants have sold electricity outside the auctions through bilateral contracts, *see* Exelon Br. 41 (citing A.142 ¶ 54),[3] while the other noted that Quad Cities failed to clear the PJM wholesale auction for three consecutive years. *See id.* 36, 38-40 (citing A.25 ¶ 55); State Appellees Br. 46 n.17. Under the Illinois program, the state provides ZECs for generation of electric that is then sold outside of the auction, not just for generation sold at the wholesale auction.

---

[3] *See also* Oral Argument at 41:41-41:46 (Exelon counsel noting that many nuclear plants in the region "sell largely to retail customers"); *id.* at 45:06-45:15 (State counsel noting that the Exelon plants can bypass the wholesale auctions by selling through bilateral contracts); *id.* at 58:15-58:22 (Plaintiffs-Appellants' counsel acknowledging that the plants may sell power through bilateral contracts).

The generator Appellants (No. 17-2445), however, maintain that this "formal legal requirement"—i.e., the State requiring auction participation as a condition of receiving ZECs—does not settle the preemption question. *See* Appellants Br. 14, 44. In their view, the Federal Power Act preempts the ZEC program because the *practical effect* of the program amounts to a condition of payment on clearing the wholesale auction, making it effectively "no different" than the Maryland program preempted in *Hughes. See id.* 17-18, 45. They allege that Clinton and Quad Cities have no alternative to bidding into the auctions, "such that the ZEC subsidy 'will not occur unless the 'winning' nuclear generators sell their energy into the wholesale markets.'" *See id.* 43 (quoting A.30 (Compl. ¶ 64)); Op. 29.

But *Hughes* does not go so far. Business realities and market forces cannot be so easily equated with requirements imposed by force of law—a generator's "business decision" to sell at the auction "is irrelevant from a preemption perspective" and is not equivalent to a "state directive." *Coal. For Competitive Elec. v. Zibelman*, 272 F. Supp. 3d 554, 570 (S.D.N.Y. 2017), *on appeal*, 2d Cir. No. 17-925. This Court has distinguished between state action "by contract or other

agreement," where "there is no issue of federal preemption," and state action "by regulation," where "the possibility of federal preemption may arise." *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 682 (7th Cir. 2011); *cf. FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 777 (2016) ("EPSA's primary argument that FERC has usurped state power . . . maintains that the Rule 'effectively,' even though not 'nominal[ly],' regulates retail prices. . . . The modifier 'effective' is doing quite a lot of work in that argument—more work than any conventional understanding of rate-setting allows.") (internal citations omitted, modifications in original).

Equating private action with state regulation would take preemption doctrine down a path not contemplated by the Supreme Court's "limited" holding: "So long as a State does not condition payment of funds on capacity clearing the [wholesale] auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable." *Hughes*, 136 S. Ct. at 1299; *see also Zibelman*, 272 F. Supp. 3d at 571 ("The law of preemption examines state action and considers whether state action has intruded upon the federal government's turf."). The district court properly relied

on this distinction in finding the ZEC program not preempted because it "does not *mandate* auction clearing . . . and the state . . . is not imposing a condition directly on wholesale transactions."  Op. 31 (emphasis in original); *see also Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 102 (2d Cir. 2017) (holding that appellant failed to allege that the Connecticut program at issue was "likely to produce contracts that violate the bright line laid out in *Hughes*:  the [requests for proposals] do not, for instance, require bids that are '[ ]tethered to a generator's wholesale market participation' or that 'condition[ ] payment of funds on capacity clearing the auction.'") (quoting *Hughes*, 136 S. Ct. at 1299).

Nor does the price adjustment feature of the Illinois statute (*see supra* pp. 2-3) raise the sort of concerns as did the Maryland "contract for differences" in *Hughes*.  Unlike the payment under the Maryland program, the Illinois statute does not link ZECs to a particular generator's actual wholesale revenues.  *See* Op. 31; *Hughes*, 136 S. Ct. at 1295 ("If CPV's capacity clears the PJM capacity auction and the clearing price falls below the price guaranteed in the contract for differences, Maryland [load-serving entities] pay CPV the difference between the contract price and the clearing price.").  Rather, the price

adjustment reduces ZEC payments by a combination of forecasted energy prices and capacity prices averaged over two different regional markets. *See* Op. 31 ("[T]he 'tether' in this case is not to wholesale participation or transactional pricing; the tether is to broader, indirect wholesale market forces."). This provision is not directed at wholesale markets, but instead ensures that ZECs remain affordable "to retail customers" in Illinois should electricity prices rise. *See* Op. 9 (quoting 20 ILCS 3855/1-75(d-5)(1)(B)).

And unlike the Maryland generator in *Hughes*, the Clinton and Quad Cities plants here are not limited to selling their output through the PJM auction. *See Hughes*, 136 S. Ct. at 1295 ("Because CPV sells its capacity exclusively in the PJM auction market, CPV receives no payment . . . if its capacity fails to clear the auction."); A.142 ¶ 54 (complaint by plaintiff Village of Old Mill Creek, *et al.*) ("Exelon Generation sells electric energy and capacity from the Quad Cities and Clinton nuclear plants . . . pursuant to wholesale bilateral transactions," and in regional wholesale auctions); *see also* Oral Argument at 41:41-41:46 (Exelon counsel noting that many nuclear plants in the region "sell largely to retail customers"). They may receive

ZECs for production of zero-emission power, regardless of whether they opt to sell that power via wholesale auction, bilateral contracts, or directly to retail customers. *See* Op. 7-8, 30-31; *see also* A.25 ¶ 55 (complaint by plaintiff Electric Power Supply Association, *et al.*) (acknowledging that Quad Cities failed to clear recent PJM wholesale capacity auction); *Hughes*, 136 S. Ct. at 1298 ("States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain.").

### B. *Hughes* Recognizes the Ability of States To Craft Policy Initiatives In Ways That Will Avoid Federal Preemption.

The Court in *Hughes* found that it need not address an assortment of state actions to "encourag[e] production of new or clean generation through measures 'untethered to a generator's wholesale market participation.'" *Hughes*, 136 S. Ct. at 1299; *see also id.* at 1292 (noting reserved authority of the States over retail sales and in-state generation facilities) (citing 16 U.S.C. § 824(b)). Such actions may include "tax incentives, land grants, direct subsidies, construction of state-owned generation facilities, or re-regulation of the energy sector." *Id.* at 1299. The Third Circuit, for example, has explained that states

retain regulatory control over generation and state regulation can

impact interstate rates without falling within FERC's exclusive control.

> The states may select the type of generation to be built —
> wind or solar, gas or coal — and where to build the facility.
> Or states may elect to build no electric generation facilities at
> all. The states' regulatory choices accumulate into the
> available supply transacted through the interstate market.
> The Federal Power Act grants FERC exclusive control over
> whether rates are 'just and reasonable,' but FERC's authority
> over interstate rates does not carry with it exclusive control
> over any and every force that influences interstate rates.

*PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 255 (3d Cir. 2014),

*cert. denied*, 136 S. Ct. 1728 (2016); *see also N.J. Bd. of Pub. Utils. v.*

*FERC*, 744 F.3d 74, 98 (3d Cir. 2014) ("[W]hat FERC has actually done

here is permit states to develop whatever capacity resources they wish,

and to use those resources to any extent that they wish, while

approving rules that prevent the state's choices from adversely affecting

wholesale capacity rates."). The district court here correctly reached

the same conclusion: "States may influence, through regulation, which

generators participate in FERC's market, even though the end result

may affect the wholesale market. Plaintiffs do not dispute that

[renewable energy credit] programs, tax incentives, and carbon taxes,

which are within the states' jurisdiction, are lawful." Op. 25.

*Hughes* joins a line of prior Court decisions that, in the context of energy regulation, interpret the law on preemption with some measure of modesty. In those cases, the Court found that incidental effects of state regulation on matters of federal concern do not rise to the level of preempting those state laws—what matters, in terms of the constitutional preemption concern, is whether the challenged state laws *target* those areas reserved by Congress for federal regulation. *See, e.g., Oneok*, 135 S. Ct. at 1599 (finding that the Court's precedents on preemption of state laws "emphasize the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted") (emphasis in original); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 514 (1989) ("To find field pre-emption of Kansas' regulation merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of [Natural Gas Act] § 1(b) that leaves to the States control over production, for there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market and contractual situations."); *see also Allco*, 861 F.3d at 101 ("[I]ncidental effect on wholesale prices does not, however, amount

to a regulation of the interstate wholesale electricity market that infringes on FERC's jurisdiction.").  State laws that so target, or have a direct effect on, areas reserved for federal regulation raise the specter of preemption, even if not identical to the Maryland program at issue in *Hughes*.

But, as the Supreme Court recently explained in *FERC v. Electric Power Supply Association*, wholesale and retail electricity markets, subject to federal (wholesale) and state (retail) regulation, cannot be "hermetically sealed" from one another.  136 S. Ct. at 776; *see also* Op. 27.  In this context, a subsidy like the ZEC that *affects* (in some way) wholesale rates should not be conflated with a state law that *targets* the wholesale market.  *See* Op. 26.  As discussed in more detail immediately below, if FERC were to determine that such an effect renders wholesale rates unjust and unreasonable, then FERC could address that concern under its statutory authority, rather than as a matter of constitutional preemption.

## II.   The Illinois Statute Does Not Impede The Commission's Statutory Ability To Regulate The Wholesale Markets.

This leaves the question of what steps can or should be taken, and by whom, to ameliorate the effects of state subsidy programs that are

19

not preempted. *See Allco*, 861 F.3d at 101 (no violation of "bright line laid out in *Hughes*" because Connecticut program at issue did not require bids tethered to a generator's wholesale market participation or condition payment of funds on capacity clearing the auction). If such programs, in fact, impair FERC-jurisdictional wholesale capacity markets, the solution lies with the Commission, not with courts. *See* Op. 34 ("The market distortion caused by subsidizing nuclear power can be addressed by FERC and the interplay between state and federal regulation can continue to exist.").

The Commission can exercise its responsibility under the Federal Power Act to ensure just and reasonable prices in the wholesale markets subject to its jurisdiction. The Court thus need not, and should not, resort here to the extraordinary and blunt remedy of preemption.

Indeed, the interplay of state policies and wholesale markets—specifically how, and subject to what restrictions, generators that receive state support may participate in wholesale markets—is very much a live issue at the Commission. The Commission recently approved a proposal by the New England Independent System Operator to allow state-supported renewable resources to obtain wholesale

capacity supply obligations. New England Order P 1, 25; *see supra* pp.

5-6. Such resources may do so if their market entry is coordinated with

the market exit of an equal quantity of retiring capacity. *See* New

England Order PP 4, 6, 9. The approved proposal would phase out the

existing rule that exempted up to 200 megawatts of certain state-

supported renewable resources from the minimum-offer-price rule. *See*

*id.* PP 3, 24-25, 99; *see also ISO New England Inc.*, 158 FERC ¶ 61,138,

at PP 2, 4 (2017). Several FERC Commissioners attached separate

statements to the Commission's orders, elaborating on their views as to

the interplay of state policies and wholesale markets. *See* New England

Order, concurrence in part (LaFleur, Comm'r); *id.*, dissent (Powelson,

Comm'r); *id.*, dissent in part and concurrence in part (Glick, Comm'r).

The Commission also is now considering whether PJM should

revise its wholesale market rules to deal with the effects of state

subsidies, including ZECs.[4] *See* Calpine Compl. at 1-3; *supra* pp. 4-5.

After the Commission issues an order in that proceeding, aggrieved

---

[4] The Commission declined the district court's April 24, 2017
invitation to submit an amicus brief because of the pending *Calpine*
complaint, as well as the agency's inability, at that time, to issue an
order on that complaint due to a lack of a quorum.

parties will have the opportunity to request rehearing of that order, *see* 16 U.S.C. § 825*l*(a). On rehearing, the Commission may change its mind or modify its initial order. And ultimately, after it issues a final order, the Commission will need to defend its decisionmaking in federal court should an aggrieved party petition a court of appeals for review. *See* 16 U.S.C. § 825*l*(b). The Commission might have the opportunity to consider the issue in other proceedings as well.

Congress chose this particular path for the agency to regulate and for courts to review such regulation. The Illinois law poses no obstacle to the Commission exercising its regulatory authority under the Federal Power Act. The statutory framework thus does not support preemption here.

## III. The Commission Has Previously Found That Certain State Programs Supporting Clean Power Are Not Within Its Jurisdiction Over Wholesale Rates.

The Commission has previously addressed state programs that support clean power in a variety of ways, such as credits and purchase obligations. In those proceedings, FERC has provided useful guidance on when such programs may implicate the Commission's authority over wholesale rates and practices.

*Renewable energy credits.* In *WSPP Inc.*, 139 FERC ¶ 61,011 (2012), the Commission considered state programs that provide renewable energy credits (or "RECs") to particular generators. RECs are "state-created and state-issued instruments certifying that electric energy was generated pursuant to certain requirements and standards." *Id.* P 21; *see also Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008) ("Generally speaking, RECs are inventions of state property law, whereby the renewable energy attributes are 'unbundled' from the energy itself and sold separately.").

The existence of federal authority over RECs depended, in the Commission's view, on the relationship between the REC and the sale at wholesale (or transmission of) of electric energy in interstate commerce. So, if the wholesale energy sale and REC sale take place as part of the same transaction, then the REC is a charge "in connection with" a FERC-jurisdictional service that directly affects the rates for wholesale energy. *WSPP*, 139 FERC ¶ 61,011, at P 24.

The Commission has jurisdiction over both portions of this "bundled" transaction. And the same goes for a wholesale energy sale that requires the use of an emissions allowance—both that sale and the

cost of allowances in connection with the sale are treated as directly

"affecting" FERC-jurisdictional rates or services, and are subject to

Commission review under section 205 of the Federal Power Act, 16

U.S.C. § 824d. *See id.* P 23 (citing *Edison Elec. Inst.*, 69 FERC

¶ 61,344, at 62,289 (1994)).  FERC's jurisdiction applies in such

circumstances regardless of the form of the bundled transaction, so

contracting parties cannot avoid it simply "by splitting a unified

agreement into separate agreements, one for the sale of unbundled

RECs and one for the sale of energy." *See id.* P 26.

But RECs "unbundled" from and independent of a wholesale

energy transaction would not fall within the Commission's statutory

jurisdiction.  Such instruments—be they in the form of credits or

emissions allowances—do not directly affect wholesale energy rates and

are not "in connection with" sales of electricity at wholesale. *See id.*

PP 23-24; *see also* Op. 32-33; *Elec. Power Supply Ass'n*, 136 S. Ct. at

774 ("[W]e now approve[] a common-sense construction of the FPA's

language, limiting FERC's 'affecting' jurisdiction to rules or practices

that 'directly affect the [wholesale] rate.'  As we have explained in

addressing similar terms like 'relating to' or 'in connection with,' a non-

hyperliteral reading is needed to prevent the statute from assuming near-infinite breadth.") (internal citations omitted).  Nor do such unbundled transactions constitute the transmission of energy, or the sale of energy at wholesale, in interstate commerce.  *Id.* P 21.  As such, they are not within the Commission's statutory reach.  *See id.*

   ***Requirements to purchase renewable energy.*** State laws that obligate utilities to purchase electricity from certain types of generating facilities do not intrude on the Public Utility Regulatory Policies Act of 1978 ("PURPA"), so long as they neither set rates for wholesale sales of electric energy by public utilities nor set payment of rates to "qualifying facilities" in excess of the purchasing utilities' avoided costs.  *See, e.g.,* *Cal. Pub. Utils. Comm'n,* 132 FERC ¶ 61,047, at P 66 (2010); *Midwest Power Sys., Inc.,* 78 FERC ¶ 61,067, at 61,246 (1997); *Conn. Light & Power Co.,* 70 FERC ¶ 61,012, at 61,029 (1995); *see also Illinois ex rel. Greenblatt v. Commonwealth Edison Co.,* No. 11 C 2009, 2011 WL 2550834, at *2 (N.D. Ill. June 27, 2011) ("PURPA requires that utilities . . . purchase energy from certain 'Qualified Facilities' at a rate [known as the "avoided cost"] that reflects the highest rate the utility would

have paid for equivalent service had it purchased the energy elsewhere.").

In so holding, the Commission has recognized that States may—in exercising their traditional authority over electricity generation and retail operations—encourage renewable resources and direct the planning decisions of electric utilities within their jurisdiction. States may do so by requiring such utilities to purchase renewable generation, or by providing loans, subsidies, or tax credits to particular facilities on environmental or policy grounds. *See, e.g., Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at P 31 n.62 (2010); *Midwest Power Sys.*, 78 FERC ¶ 61,067, at 61,248; *So. Cal. Edison*, 71 FERC ¶ 61,269, at 62,080 (1995). And while PURPA would preempt state laws that granted rates in excess of the purchasing utilities' avoided costs, States still may account for environmental costs in deciding what those avoided-cost rates should be. *See, e.g., Cal. Pub. Utils. Comm'n*, 133 FERC ¶ 61,059, at P 26 & n.51; *So. Cal. Edison*, 71 FERC ¶ 61,269, at 62,080; *Midwest Power Sys.*, 78 FERC ¶ 61,067, at 61,248; *see also Cal. Indep. Sys. Operator Corp.*, 119 FERC ¶ 61,061, at PP 68, 86 (2007) (approving California System Operator proposal to finance the construction of new

interconnection facilities to connect wind, geothermal, and solar resources to the transmission grid, finding the proposal to be consistent with state, federal, and regional policies that encouraged clean, renewable generation).

## CONCLUSION

For the foregoing reasons, the Court should conclude that the Federal Power Act does not preempt the Illinois ZEC program.

Respectfully submitted,

<table>
<tr><td>JAMES P. DANLY<br><em>General Counsel</em></td><td>JEFFREY H. WOOD<br><em>Acting Assistant Attorney General</em></td></tr>
<tr><td>DAVID L. MORENOFF<br><em>Deputy General Counsel</em></td><td>ERIC GRANT<br><em>Deputy Assistant Attorney General</em></td></tr>
<tr><td>ROBERT H. SOLOMON<br><em>Solicitor</em></td><td>JENNIFER S. NEUMANN<br>MATTHEW R. OAKES<br>ROBERT J. LUNDMAN</td></tr>
</table>

 /s/ Anand R. Viswanathan
ANAND R. VISWANATHAN
*Attorney*

Federal Energy Regulatory
   Commission
888 First Street, NE
Washington, DC  20426
(202) 502-8236
Anand.Viswanathan@ferc.gov

Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7415
Washington, DC 20044
(202) 514-2496
robert.lundman@usdoj.gov

May 29, 2018

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this amicus brief complies with the type-volume limitation of Circuit Rule 29 because it contains 5,200 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century 14-point font using Microsoft Word 2013.

*/s/ Anand R. Viswanathan*
Anand R. Viswanathan
Attorney

Federal Energy Regulatory
  Commission
888 First Street, N.E.
Washington, D.C. 20426
Phone:  202-502-6537
Fax:      202-273-0901
E-mail:  Anand.Viswanathan@ferc.gov

May 29, 2018

# CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2018, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Anand R. Viswanathan*
Anand R. Viswanathan
Attorney

Federal Energy Regulatory
  Commission
888 First Street, N.E.
Washington, D.C. 20426
Phone:  202-502-6537
Fax:     202-273-0901
E-mail:  Anand.Viswanathan@ferc.gov

May 29, 2018